# Exhibit A

## Guaranty

This Guaranty, made this 21ˢᵗ day of July_____, 2014 by **SULAKHAN JOHAL**_____, and **JASVIR JOHAL**_____, (separately and together, the "Guarantor");

To:     HITACHI CAPITAL AMERICA CORP.     (hereinafter, "Hitachi")
         800 Connecticut Ave
         Norwalk, CT 06854

Each Guarantor severally requests Hitachi to extend credit to or to purchase security agreements, leases, notes, accounts and/or other obligations (herein generally termed, "Paper") of or from or otherwise to do business with:

Company:     PRIDE TRUCK SALES L.P.     (hereinafter, the "Company")
              345 Grand Island Blvd.
              Tonawanda, NY 14150

1.      To induce Hitachi to extend such credit or to make such purchase, and in consideration thereof and of benefits to accrue to each Guarantor there from, each Guarantor, as a primary obligor, irrevocably and unconditionally, jointly and severally guarantees to Hitachi that the Company will fully and promptly pay and perform all of its present and future obligations to Hitachi, whether direct or indirect, joint or several, absolute or contingent, secured or unsecured, matured or unmatured and whether originally contracted with Hitachi or otherwise acquired by Hitachi, irrespective of any invalidity or unenforceability of any such obligation or the insufficiency, invalidly or unenforceability of any security therefor, whether now existing or hereinafter incurred.

Each Guarantor also agrees as follows: (1) to pay on demand all sums due and to become due to Hitachi from the Company and all losses, costs, attorneys' fees and expenses which may be suffered by Hitachi by reason of the Company's default or default of any Guarantor without Hitachi first having to proceed against the Company or to liquidate Paper or any security therefore; and (2) to be bound by and on demand to pay any deficiency established by a sale of Paper and/or security held with or without notice to any Guarantor .

2.      This Guaranty is an unconditional guaranty of payment and performance. No Guarantor shall be released or discharged, either in whole or in part, by Hitachi's failure or delay to perfect or continue the perfection of any security interest in any property which secures the obligations of the Company or any Guarantor to Hitachi, or to protect the property covered by such security interest. The obligations of each Guarantor under this Guaranty shall remain in full force and effect until all sums due to Hitachi from the Company have been paid in full and all costs and expenses, if any, referred to in Paragraph 1 herein shall have been paid in full.

3.      Each Guarantor hereby represents and warrants that: (1) it has the power to enter into and perform this Guaranty; (2) neither this Guaranty, the execution, delivery and performance hereof, the performance of the agreements herein contained nor the consummation of the transactions herein contemplated will violate any statute, ordinance, regulation, court order or decree or decree of any other governmental authority or agency or any other agreement to which said Guarantor is subject; and (3) this Guaranty constitutes the valid and binding obligation of each Guarantor enforceable against each Guarantor in accordance with its terms.

4.      Each Guarantor waives: (1) notice of acceptance hereof; (2) presentment, demand, protest and notice of nonpayment or protest as to any note or obligation signed, accepted, endorsed or assigned to Hitachi by the Company; (3) any and all rights of subrogation, reimbursement, indemnity, exoneration, contribution or any other claim which any Guarantor may now or hereafter have against the Company or any other person directly or contingently liable for the obligations guaranteed hereunder, or with respect to the Company's property (including, without limitation, property collateralizing the Company's obligations to Hitachi ), arising from the existence or performance of this Guaranty; (4) all exemptions and homestead laws and any other demands and notices required by law; all setoffs and counterclaims; and (5) any and all defenses based on suretyship or any other applicable law, including without limitation all rights and defenses arising out of (i) an election of remedies by Hitachi even though that election of remedies may have destroyed rights of subrogation and reimbursement against the Company by operation of law or otherwise, (ii) protections afforded to the Company pursuant to anti-deficiency or similar laws limiting or discharging the Company's obligations to Hitachi, (iii) the invalidity or unenforceability of this Guaranty, (iv) the failure to notify any Guarantor of the disposition of any property securing the obligations of the Company, (v) the requirement, if any, that Hitachi marshal assets (vi) the commercial reasonableness of such disposition or the impairment, however caused, of the value of such property, and (vii) any duty on



Hitachi's part (should such duty exist) to disclose to any Guarantor any matter, fact or thing related to the business operations or condition (financial or otherwise) of the Company or its affiliates or property, whether now or hereafter known by Hitachi.

5.      Hitachi may at any time and from time to time, without the consent of any Guarantor, without notice to any Guarantor and without affecting or impairing the obligation of any Guarantor hereunder, do any of the following:

(a) renew, extend (including extensions beyond the original term of the respective item of Paper), modify (including changes in interest rates), release or discharge any obligations of the Company, of its customers, of co-guarantors (whether hereunder or under a separate instrument) or of any other party at any time directly or contingently liable for the payment of any of said obligations;

(b) accept partial payments of said obligations;

(c) accept new or additional documents, instruments or agreements relating to or in substitution of said obligations;

(d) settle, release (by operation of law or otherwise), compound, compromise, collect or liquidate any of said obligations and the security therefore in any manner;

(e) consent to the transfer or return of the security, and take hold additional security or guaranties for said obligations;

(f) amend, exchange, release or waive any security or guaranty; or

(g) bid and purchase at any sale of Paper or security and apply any proceeds or security, and direct the order and manner of sale.

6.      If a claim is made upon Hitachi at any time for repayment or recovery of any amount(s) or otherwise received by Hitachi, from any source, in payment of or on account of any of the obligations of the Company guaranteed hereunder and Hitachi repays or otherwise becomes liable for all or any part of such claim by reason of:

(a) any judgment, decree or order of any court or administrative body having competent jurisdiction; or

(b) any settlement or compromise of any such claim,

each Guarantor shall remain jointly and severally liable to Hitachi hereunder for the amount so repaid or for which Hitachi is otherwise liable to the same extent as if such amount(s) had never been received by Hitachi, notwithstanding any termination hereof or the cancellation of any note or other agreement evidencing any of the obligations of the Company. This Guaranty shall bind each Guarantor's respective heirs, administrators, representatives, successors, and assigns and shall inure to the benefit of Hitachi's successors and assigns including, but not limited to, any party to whom Hitachi may assign any item or items of Paper. Each Guarantor hereby waives notice of any such assignment. All of Hitachi's rights are cumulative and not alternative.

7.      The invalidity or unenforceability of any one or more phrases, sentences, clauses or section of this Guaranty shall not affect the validity or enforceability of the remaining portions of this Guaranty, or any part thereof.

8.      This Guaranty shall be interpreted under and governed by the laws of the State of Connecticut, without regard to conflicts of laws principles. Each Guarantor agrees that the negotiation and acceptance of this Guaranty has taken place in the State of Connecticut. The parties consent and agree that all actions or proceedings arising out of, relating to or pertaining to this Guaranty may be tried and litigated in the state and federal courts located in the State of Connecticut provided, however, that any suit seeking enforcement against the property securing the Paper may be brought, at Hitachi's option, in the courts of any jurisdiction where Secured Party elects to bring such action or where such property may be found.

9.      **Nothing contained in this Guaranty shall preclude Hitachi from commencing any action in any court having jurisdiction thereof with respect to any matter arising out of, relating to or pertain to this Guaranty.**  However, at the sole option of Hitachi, any controversy, claim or dispute arising out of, relating to or pertaining to this Guaranty or the interpretation, breach, enforcement or subject matter thereof, that cannot be settled by mutual agreement of the parties, may: (i) be submitted to arbitration by one (1) arbitrator (unless Hitachi determines to have multiple arbitrators) in Norwalk, Connecticut, or such other location chosen by Hitachi, conducted by the American Arbitration Association, in accordance with its Commercial Arbitration Rules then in effect or conducted by any other recognized arbitration association or entity in accordance with like rules ("Arbitration"); or (ii) be determined through any alternative dispute resolution ("ADR") procedure provided for under the Laws of the State of Connecticut or the Guarantor's state of incorporation; with said governing law and ADR procedure to be selected by Hitachi. Judgment upon any arbitration award or ADR determination may be entered in any



court of any state or county or application may be made to such court for judicial acceptance of the award or determination and an order of enforcement, as the law of the jurisdiction may require or allow.  The arbitration award or ADR determination shall be final and no appeal shall be taken by either party.  The costs of any such arbitration or ADR shall be borne equally by the Guarantor and Hitachi, unless the arbitrator(s) or ADR decision-maker deems such division of costs to be inequitable, in which event the arbitrator(s) or ADR decision-maker may allocate the costs of arbitration or ADR among the parities thereto as s/he deems just and equitable under the circumstances.

10.     **THE GUARANTOR AND HITACHI HEREBY WAIVE TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM BROUGHT BY OR AGAINST EACH OTHER ON, OR IN RESPECT OF, ANY MATTER ARISING OUT OF, RELATING TO OR PERTAINING TO THIS GUARANTY OR THE INTERPRETATION, BREACH, ENFORCEMENT OR SUBJECT MATTER THEREOF, THE RELATIONSHIP BETWEEN THE COMPANY AND THE SECURED PARTY AND/OR ANY CLAIM OF INJURY OR DAMAGE FROM ANY OTHER RELATIONSHIP BETWEEN THE PARTIES HERETO.**

        **IN WITNESS WHEREOF**, each Guarantor has executed this Guaranty as of the date first above written.

ATTEST:

Print Name: _Amrinder Johal_

X _S. Johal_
  **SULAKHAN JOHAL**

_97 Coastline Drive_
Address
_Brampton   ON   L6Y 0S4_
City          State          Zip


ATTEST:

Print Name: _Amrinder Johal_

X _J. Johal_
  **JASVIR JOHAL**

_4 Pergola Way_
Address
_Brampton   ON   L6Y 5M6_
City          State          Zip

ORIGINAL

# Exhibit B

## FLOORPLAN AND SECURITY AGREEMENT ("Agreement")

**November 21, 2018**

**This Floorplan and Security Agreement is entered into by and between:**

**DEALER:**

PRIDE TRUCK SALES L.P.
15666 Slover Avenue
Fontana, CA 92337

2546 Turnpike Road
Stockton, CA 95206

1125 Alexis Road
Toledo, OH 43612
("**Dealer**")

And

**SECURED PARTY:**

HITACHI CAPITAL AMERICA CORP.
800 Connecticut Avenue
Norwalk, CT 06854
("**Secured Party**")

1.    **Extensions of Credit**.

     Secured Party may, from time to time and subject to the terms of this Agreement, extend credit to or on behalf of the Dealer to purchase inventory. Secured Party's decision to lend or otherwise advance funds hereunder is solely at the Secured Party's discretion. *Secured Party may combine all of Secured Party's advances to Dealer or on Dealer's behalf, whether under this or any other agreement, together with all finance charges, fees, and expenses related thereto, to constitute one debt and loan obligation owed by Dealer to Secured Party.* Secured Party may, without notice or explanation to Dealer, elect not to finance any particular inventory transactions. All advances and other transactions hereunder are for business purposes and not for personal, household or any other consumer purposes.

2.    **Security Interest**.

     (a)    Dealer hereby grants to Secured Party an absolute and cross-collateralized security interest in and to all of the Collateral hereby or otherwise pledged

2660510 v4

as security for all of the Obligations. (b) The term "Collateral" is defined herein as all personal property of Dealer, whether such property or Dealer's right, title or interest therein or thereto is now owned or existing or hereafter acquired or arising, and wherever located, including without limitation, any and all inventory acquired by virtue of any extensions of credit hereunder as well as any and all Accounts, Inventory, Equipment, Fixtures, other Goods, General Intangibles (including Payment Intangibles), Chattel Paper (whether tangible or electronic), Instruments (including Promissory Notes), Insurance (and Insurance proceeds), Deposit Accounts, Investment Property and Documents and all Proceeds and Products of the foregoing.  The Collateral includes all books and records, electronic or otherwise, which evidence or relate to the foregoing personal property, and all computers, disks, media and other devices in which such records are stored.

(c)     The term "Obligations" shall mean any and all indebtedness or other obligations of Dealer to Secured Party, whether such indebtedness or other obligations arise under this Agreement and/or any Credit Transaction Confirmation generated hereunder or any other existing or future  debt obligations of Dealer to Secured Party, and whether for principal, interest, fees, Charges, expenses, indemnification obligations or otherwise, and whether such indebtedness or other obligations are existing, future, direct, indirect, acquired, contractual, non-contractual,  fixed, contingent or otherwise.

**The creation of any other security interest by Dealer in the Collateral violates the rights of the Secured Party.**

3.     **Financing Terms.**

Secured Party and Dealer hereby agree to set forth in this Agreement only the general terms of the financing framework with Secured Party as certain financial terms depend, in part, upon factors which vary from time to time, including without limitation, Secured Party's floorplan volume with Dealer and other economic or financial factors. Upon approving a request to finance an item of inventory, Secured Party will transmit, send or otherwise make available to Dealer a "Credit Transaction Confirmation" which is a record that identifies the specific Collateral financed and the advance of monies made and memorializes the terms and conditions of repayment of such advance. Dealer agrees that Dealer's failure to notify Secured Party in writing of any objection to the terms of a Credit Transaction Confirmation within three (3) days after a Credit Transaction Confirmation is transmitted, sent or otherwise made available to Dealer shall constitute Dealer's (a) acceptance of all terms thereof, (b) agreement that Secured Party is financing such inventory at Dealer's request, and (c) agreement that such Credit Transaction Confirmation will be incorporated herein by reference.  If Dealer objects to the terms of any Credit Transaction Confirmation. Dealer will pay Secured Party for such inventory in accordance with the most recent terms for similar inventory (included in the most recent Credit Transaction Confirmation) to which Dealer has not objected (or if there are no prior terms then at 18% per annum) subject to termination of this Agreement by Secured Party and its rights under the termination provision contained herein.

4.     **Representations, Agreements, Warranties and Covenants of Dealer.**

(a)     The Dealer hereby represents and warrants as of the date hereof and at the time of each subsequent approval of financing and advance hereunder that: (i) Dealer does not conduct business under any trade names or styles except as disclosed by the Dealer to the Secured Party in writing and the Dealer has the authority to enter into and perform the obligations under this Agreement and Dealer will not violate its organizational documents, or any law, regulation or agreement binding upon it, by entering into or performing its obligations under this Agreement; (ii) Dealer will only keep Collateral at locations within the U.S. that have been disclosed to Secured Party and Dealer shall not move the Collateral from said disclosed location(s) without the written approval of Secured Party; (iii) all information supplied by Dealer to Secured Party, including any financial, credit or accounting statements or application for credit, in connection with this Agreement is true, correct and complete; (iv) this Agreement correctly sets forth Dealer's true legal name, description of organization, the state in which the Dealer is incorporated or otherwise organized and Dealer's organization number; (v)  that except for the security interest created by this Agreement, the  Dealer is the owner of the Collateral free and clear of any lien, security interest or encumbrance, and that the Dealer will defend the Collateral against all claims and demands of all persons at any time claiming any interest therein; and (vi) there are no actions or proceedings pending or threatened against Dealer which might result in a material adverse change in Dealer's financial or business condition.

(b)     Dealer shall not sell, encumber, grant a security interest in or dispose of or permit the sale, encumbrance or disposal of any of the Collateral without the Secured Party's prior written consent, except for sales of the Collateral financed by the Secured Party in the ordinary course of Dealer's business.

(c)     Dealer will: (1) keep all Collateral at permitted locations and keep all tangible Collateral safe and secure, in good order, repair and operating condition and insured as required by Secured Party; (2) promptly file all tax returns required by law and promptly pay all taxes, fees, and other governmental charges for which it is liable, including without limitation all governmental charges against the Collateral or this Agreement; (3) permit Secured Party and its designees, without notice, to inspect the Collateral during normal business hours and at any other time Secured Party deems desirable (and Dealer hereby grants Secured Party and its designees an irrevocable license to enter Dealer's business locations during normal business hours without notice to Dealer to account for and inspect all Collateral and to examine and copy Dealer's books and records related to the Collateral), and in connection with any inspection, provide Secured Party and its designees safe and secure access to the Collateral and comply with any request made by Secured Party or its designees to move the Collateral in order to provide such safe and secure access; (4) keep complete and accurate records of its business, including inventory, accounts and sales, and permit Secured Party and its designees to inspect and copy such records upon request; (5) furnish Secured Party with such additional information regarding the Collateral and Dealer's business and financial condition as Secured Party may from time to time reasonably request; (6) immediately notify Secured Party of any material adverse change in Dealer's prospects, business, operations or condition (financial or otherwise) or in any Collateral; (7) execute (or cause any third party in possession of Collateral to execute) all documents Secured Party requests to perfect and maintain Secured Party's security interest in the Collateral; (8) deliver to Secured Party immediately upon

3

request by Secured Party each certificate of title or statement of origin issued for Collateral financed by Secured Party; (9) at all times be duly organized, existing, in good standing, qualified and licensed to do business in each jurisdiction in which the nature of its business or property so requires and, when requested, provide Secured Party with documentation evidencing the same; (10) notify Secured Party of the commencement of any material legal proceedings against Dealer or any Guarantor (as defined below); and (k) comply with all laws, rules and regulations applicable to Dealer, including without limitation, the USA PATRIOT ACT and all laws, rules and regulations relating to import or export controls or anti-money laundering.

(d)    Dealer will not without Secured Party's prior written consent: (1) use (except for demonstration for sale), rent, lease, sell, transfer, consign, license, encumber of otherwise dispose of Collateral except for sales of inventory at retail in the ordinary course of Dealer's business; (2) engage in any other material transaction not in the ordinary courts of Dealer's business; (3) change its business in any material manner or its organizational structure or be a party to a merger or consolidation or change its registration to a registered organization other than as specified above; (4) change its name without giving Secured Party at least thirty (30) days' prior written notice thereof; (5) change the state in which it is incorporated or otherwise organized (except upon thirty (30) days' prior written notice to Secured Party); (6) change its chief executive office or office where it keeps its records with respect to accounts or chattel paper;  (7) store inventory financed by Secured Party with any third party; or (9) sell or otherwise transfer inventory to a Dealer Affiliate. "Dealer Affiliate" means any person that: (i) directly or indirectly controls, is controlled by or is under common control with Dealer, (ii) directly or indirectly owns 5% or more of Dealer, (iii) is a director, partner, manager, or officer of Dealer or an affiliate of Dealer, or (iv)any person related to Dealer or an affiliate of Dealer.

(e)    Dealer hereby covenants that (1) the Dealer will promptly pay any and all taxes, assessments and governmental charges upon the Collateral prior to the date penalties are attached thereto, except to the extent that a protest of such taxes, assessments and charges shall be instituted and diligently prosecuted in good faith by the  Dealer and (i)  Dealer has given Secured Party notice of any such contest, and (ii) Secured Party is satisfied that while any such protest is pending there will be no impairment of the enforceability, validity, or priority of any of the Secured Party's liens in and to the Collateral; (2) the Dealer will immediately notify the Secured Party of any event causing a substantial loss or diminution in the value of all or any material part of the Collateral and an estimate of the amount of such loss or diminution; and (3) the Dealer will endeavor to collect or cause to be collected from its customers all amounts owing under or on account of any customer receivable.

(f)    In the event that Dealer contemplates any exporting of the assets financed (including technology supplied) herein, Dealer shall follow all procedures as required by the US Export Administration Regulations and any related export control laws and regulations promulgated and administered by the government of any country having jurisdiction over the parties or the transactions contemplated herein.

**5.    Payment Terms and Charges.**

    (a)    Dealer will immediately pay Secured Party the amount of the Obligations owed Secured Party on each item of Collateral financed by Secured Party on the earliest occurrence of any of the following events: (i) when such Collateral is unaccounted for; (ii) in strict accordance with the installment payment schedule; (iii) in strict accordance with any curtailment schedule for such Collateral; and (iv) when otherwise required under the terms of this Agreement.  The payment and curtailment terms are or may be set forth in a Credit Transaction Confirmation.  Secured Party may apply: (1) payments to pay any costs (direct or indirect), Charges or fees first, then to reduce finance charges and then principal, regardless of Dealer's instructions; and (2) principal payments to the oldest (earliest) invoice for Collateral financed by Secured Party, but in any event, all principal payments, may in Secured Party's sole discretion, first be applied to such Collateral which is sold, lost, stolen, damaged, rented, leased, or otherwise disposed of or unaccounted for.  Any payment hereunder which would otherwise be due on a day which is not a Business Day, shall be due on the next succeeding Business Day, with such extension of time included in any calculation of applicable finance charges.

    (b)    If Dealer (i) fails to immediately remit funds to Secured Party upon the maturity of Dealer's applicable payment terms with respect to such advance or upon the sale, transfer, rental, lease, loss, theft, damage, or other disposition of or inability to account for any inventory financed by Secured Party for Debtor (a "sale out of trust" or "SOT") or (ii) is required to make immediate payment to Secured Party of any past due obligation discovered during any Collateral review, or at any other time, then Secured Party's acceptance of any payment with respect to such past due obligation (whether in full or partial satisfaction of such obligation) shall not be construed to have waived or amended the terms of its financing program.  Dealer will send all such payments to Secured Party as directed.

    (c)    Any advances which are not used to acquire inventory, as contemplated hereby, shall be paid on demand unless otherwise provided in this Agreement or in any Credit Transaction Confirmation.  In order to adequately secure Dealer's Obligations to Secured Party, Dealer shall, at Secured Party's request, immediately pay Secured Party the amount necessary to reduce the sum of Secured Party's outstanding advances with respect to inventory received by Dealer to an amount which does not exceed the aggregate invoice price to Dealer of the inventory in Dealer's possession which (i) is financed by Secured Party, and (ii) in which Secured Party has a perfected first priority lien.

    (d)    All payments due by Dealer to Secured Party under this Agreement or otherwise shall be made by check made on a United States bank, ACH, EDI or federal wire, in each case drawn on an account established in the name of Dealer.  Secured Party reserves the right to decline other forms of payment, including but not limited to, cashier's checks, money orders, bank drafts, third-party checks and traveler's checks. In the event of any such payment decline, Dealer's debt will remain outstanding and interest/fees permitted under Dealer's Agreement may accrue until acceptable payment is received.  Secured Party will recognize and credit payments according to its payment recognition policies from time to time in effect, or as otherwise agreed.

(e)        Dealer shall pay fees, charges, interest and any other payment obligations called for in any Credit Transaction Confirmations (collectively, "Charges") with respect to each advance in accordance with the Agreement.  Dealer shall pay Secured Party its customary Charge for any check or other item which is returned unpaid to Secured Party.  Unless otherwise provided in the Agreement, the following additional provisions shall be applicable to Charges: (i) all Charges shall be paid by Dealer monthly pursuant to the terms of the billing statement in which Charges appear; (ii) interest on an advance shall begin to accrue on the  date Secured Party makes such advance; (iii) advances or any part thereof not paid when due (and Charges not paid when due, at the option of Secured Party, shall become part of the principal amount of the Obligations and) shall bear interest at the Default Rate (as defined below); and (iv) all interest rates provided or referenced in  Credit Transaction Confirmations, are provided and referenced on the basis of a 365-day year.   For purposes of this Agreement "Default Rate" shall mean 1.5% per month.

6.     **Billing Statement and Modification of Charges and Terms.**

(a)     Secured Party will send or make available to Dealer a monthly billing statement identifying all charges due on Dealer's account with Secured Party.  The amounts owed on each monthly billing statement shall be due and payable in full immediately upon receipt unless otherwise stated in the billing statement, Credit Transaction Confirmation or other written document provided by Secured Party.  The billing statement shall be an account stated unless Secured Party receives Dealer's written objection within 15 days after it is sent or made available to Dealer.  If Dealer does not receive by the 25th day of any given month payment of all charges accrued to Dealer's account with Secured Party during the prior month, Dealer will pay Secured Party a late fee equal to the greater of $5 or 5% of the amount of such charges (payment of such fee does not waive the default caused by the late payment).  Secured Party may adjust the billing at any time to conform to applicable law and this Agreement.

(b)     Secured Party may, from time to time, charge reasonable fees in connection with the servicing and administration of Dealer's account.  Secured Party may, from time to time, provide written notice to Dealer of new or altered fees, interest and/or other finance charges, policies, practices and other charges and/or credit terms ("Fees and Terms") payable or owed by Dealer on its account or in connection with specific services to be effective as of the date of the notice date, or such other future effective date as Secured Party shall advise, with respect to existing Obligations owed by Dealer to Secured Party and/or to Obligations incurred or arising after such notice or future effective date, all as Secured Party may elect by so indicating in such notice.  Such notice may be delivered by mail, courier or electronically in a separate writing or website posting, or set forth in the Credit Transaction Confirmation and/or the billing statement.

7.     **Default.**

The occurrence of one or more of the following events shall constitute a default by Dealer (a "Default"): (a) Dealer shall fail to pay any Obligations when due or any remittance for any Obligations is dishonored when first presented for payment; (b) any representation made to Secured Party by Dealer or by any guarantor, surety, issuer of a

6

letter of credit or any person other than Dealer primarily or secondarily liable with respect to any Obligations (a "Guarantor") shall not be true when made or if Dealer or any Guarantor shall breach any covenant, warranty or agreement to or with Secured Party; (c) Dealer (including, if Dealer is a partnership or limited liability company, any partner or member of Dealer) or any Guarantor shall die, become insolvent or generally fail to pay its debts as they become due, if a business, shall cease to do business as a going concern; (d) any letter of credit or other form of collateral provided by Dealer or a Guarantor to Secured Party with respect to any Obligations or Collateral shall terminate or not be renewed at least sixty (60) days prior to its stated expiration or maturity; (e) Dealer abandons any Collateral; (f) any Guarantor shall revoke, terminate or limit, or take any action purporting to revoke, terminate or limit, any guaranty or other assurance of payment relating to any Obligations; (g) Dealer or any Guarantor shall make an assignment for the benefit of creditors, or commence a proceeding with respect to itself under any bankruptcy, reorganization, arrangement, insolvency, receivership, dissolution or liquidation statute or similar law of any jurisdiction, or any such proceeding shall be commenced against it or any of its property (an "Automatic Default"); (h) an attachment, sale of seizure shall be issued or shall be executed against any assets of Dealer or of any Guarantor; (i) Dealer shall lose, or shall be in default of, any franchise, license or right to deal in any Collateral which Secured Party finances: (j) Dealer, Guarantor or any third party shall file any correction or termination statement with respect to any Uniform Commercial Code (the "UCC") filing made by Secured Party in connection herewith; (k) a material adverse change shall occur in the business, operations or condition (financial or otherwise) of Dealer (including, if Dealer is a partnership or limited liability company, any partner or member of Dealer) or any Guarantor or with respect to the Collateral; (l) Dealer or any Guarantor fails to pay any debt or perform any other obligation owed to Secured Party and/or any third party; (m) Dealer or any Guarantor defaults under the terms of any agreement with any Secured Party Affiliate, or (n) Secured Party in good faith believes the prospect of payment of any Obligations is impaired or Secured Party deems itself insecure.

8.    **Rights and Remedies Upon Default.**

Upon the occurrence of a Default, Secured Party shall have all rights and remedies of a secured party under the UCC as in effect in any applicable jurisdiction and other applicable law and all the rights and remedies set forth in this Agreement. Secured Party may terminate any obligations it has under this Agreement and any outstanding credit approvals immediately and/or declare any and all Obligations immediately due and payable without notice or demand.  Dealer waives notice of intent to accelerate, and of acceleration of any Obligations.  Secured Party may enter any premises of Dealer with or without process of law, without force, to search for, take possession of, and remove all of the Collateral, or any part thereof.  If Secured Party requests, Dealer shall cease disposition of and shall assemble the Collateral and make it available to Secured Party, at Dealer's expense, at a convenient place or place designated by Secured Party.  Secured Party may take possession of the Collateral or any part thereof on Dealer's premises and guaranty, endorsement, repurchase agreement or the like shall not be deemed to be a transfer subject to UCC §9-618 or any similar provision of any other applicable law, and commercially reasonable method of disposition.  Dealer shall be liable to Secured Party for any deficiency resulting from Secured Party's disposition, including without limitation a repurchase by a Vendor,

regardless of any subsequent disposition thereof. Dealer is not a beneficiary of, and has no right to require Secured Party to enforce, any repurchase agreement. If Dealer fails to perform any of its obligations under this Agreement, Secured Party may perform the same in any form or manner Secured Party in its discretion deems necessary or desirable, and all monies paid by Secured Party in connection therewith shall be additional Obligations and shall be immediately due and payable without notice together with interest payable on demand at the Default Rate. All of Secured Party's rights and remedies shall be cumulative. Dealer irrevocably waives any requirement that Secured Party retain possession and not dispose of any Collateral until after trial or final judgment or appeal thereof. Secured Party's election to extend or not extend credit to Dealer is solely at Secured Party's discretion and does not depend on the absence or existence of a Default. If a Default is in effect, and without regard to whether Secured Party has accelerated any Obligations, Secured Party may, without notice, apply the Default Rate. Secured Party has the right to set off any monies owed by Dealer whatsoever against any monies owed to Secured Party from Dealer by whatever means including the sale of any recovered Collateral

9. **Collection and Other Costs.**

In the event of a Default, Dealer shall pay to Secured Party on demand all reasonable attorneys' fees and legal expenses and other costs and expenses incurred by Secured Party in connection with establishing, perfecting, maintaining perfection of, protecting and enforcing its Lien on the Collateral (including but not limited to repossession costs, storage, repairs, etc.) and collecting any Obligations, or in connection with any modification of this Agreement, or in connection with any action or proceeding for possession or under any receivership, assignment for benefit of creditors, bankruptcy or other insolvency laws (including, without limitation, filing a proof of claim, motion for stay relief or monitoring such proceeding under any such laws to the full extent permitted under such law), involving the Dealer, any Guarantor or any Collateral. All fees, expenses costs (direct or indirect) and other amounts described in this Section shall constitute Obligations, shall be secured by the Collateral and interest shall accrue thereon at the Default Rate.

10. **Risk of Loss.**

The Collateral shall at all times be held at Dealer's risk of loss or damage. In the event that any Item of Inventory suffers reparable damage, then Dealer shall promptly repair and restore such item to good condition and good working order. In the event that any Item of Inventory is lost, stolen, confiscated, destroyed, irreparably damaged or otherwise rendered unfit for its originally intended use, then the amount of the secured Obligation attributable to such item, together with any and all accrued and unpaid interest thereon, shall be accelerated and become immediately due and payable, without notice or demand by Secured Party.

11. **Insurance.**

Dealer agrees to keep all the Collateral insured in amounts no less than those required by the Secured Party with the Secured Party named as "loss payee". All premiums on such insurance shall be paid by Dealer and copies of the policies

8

delivered to the Secured Party.  Dealer shall direct, or Secured Party on Dealer's behalf may direct if Dealer refuses to do so, each insurance company issuing any such policy to make payment of such sums directly to the Secured Party. Secured Party is hereby authorized, but not required, to act and sign any necessary documents (including Certificates of Title) as attorney-in-fact for Dealer in adjusting and/or settling any insurance claims under any such policy and in endorsing any checks or draft drawn by insurers. All risk of loss, damage to or destruction of Collateral shall at all times be on Dealer.  Dealer shall promptly remit to Secured Party in the form received with all necessary endorsements, any and all proceeds of insurance it may receive toward payment of the Obligations or pay such proceeds to Dealer.  Secured Party is to be provided with any written notice of cancellation or change in any insurance policies within two (2) business days of the issuance of such notice.

**12.   Financial Statements**.

Dealer will be required to deliver to Secured Party Dealer's year-end balance sheet and annual profit and loss statement for each of its fiscal years within twenty (20) days after the same are prepared and, upon request by Secured Party, Dealer will be required to quarterly balance sheets or any other financial information reasonably requests by Secured Party related to the Collateral or the financial condition of the Dealer or any Guarantor.

**13.   Continuation of Dealers Liability.**

Dealer's liability under this Agreement and any Credit Transaction Statements hereunder and on any Obligations shall not be affected by (a) the taking and holding of additional security, other than the Collateral herein described for the payment of the Obligations or any part thereof, or the exchange, enforcement, waiver or release of the Collateral herein described or any part thereof or any other security for the  Obligations; or (b) the release or substitution of any endorser or guarantor of the  Obligations or any part thereof or any other parties thereto.

**14.   Construction of Agreement.**

This Agreement shall not be construed to be in limitation of or in substitution for any other grant of security interest from Dealer to the Secured Party made prior to or contemporaneously herewith, and no other such grant of a security interest made subsequent to or contemporaneously herewith shall be construed to be in limitation of or in substitution for this Agreement unless expressly and specifically provided therein.

**15.   Termination.**

Either the Secured Party or the Dealer upon thirty (30) days prior written notice to the other party may terminate this Agreement, at any time.  Provided, however, Secured Party may terminate this Agreement immediately (subject only to the  "cure" period set forth  hereinabove) in the event of Default (but without an opportunity to cure a Payment Default), upon the occurrence of:  (i) any actual or attempted transfer or assignment of the Agreement or any right or obligation thereunder by Dealer or any sale or transfer of the ownership of or material change in the active management of Dealer without the prior written consent of Secured Party; (ii) the insolvency or death of

Dealer or a Guarantor or the filing of a bankruptcy petition by or against Dealer or a Guarantor or if Dealer or Guarantor makes an assignment for the benefit of creditors or a receiver is appointed for Dealer or Guarantor, or its property; (iii) If Dealer defaults in the payment of its secured Obligations or any obligations owed to Secured Party or if Dealer objects to any terms of a Credit Transaction Statement, billing statement or written notice advising of costs, fees or Charges owed; or (iv) Dealer makes any materially false statement or representation or defaults under any term or condition of this Agreement.  Said right of termination shall not affect the rights or obligations of either Secured Party or Dealer arising prior to the effective date of termination and shall be in addition to and not in place of all other rights of Secured Party set forth in this Agreement, the Credit Transaction Confirmations and Obligations or otherwise.  Upon termination of the Agreement, all Obligations including any fees and costs incurred shall become immediately due and payable without notice or demand.  Upon any termination, Dealer shall remain fully liable to Secured Party for all Obligations arising prior to or after termination, and all of Secured Party's rights and remedies and its security interests shall continue in full force and effect until all Obligations to Secured Party are paid and all obligations of Dealer are performed in full.  All waivers and indemnifications in Secured Party's favor set forth in this Agreement will survive any termination of this Agreement.

**16.    Choice of Law.**

This Agreement shall be interpreted under and governed by the laws of the State of Connecticut, without regard to conflicts of laws principles. The parties consent and agree that all actions or proceedings arising out of, relating to or pertaining to this Agreement may be tried and litigated in the state and federal courts located in the State of Connecticut provided, however, that any suit seeking enforcement against the Collateral may be brought, at Secured Party's option, in the courts of any jurisdiction where such Collateral may be found.

**17.    Power of Attorney.**

Dealer authorizes Secured Party to: (a) file financing statements and amendments thereto describing Secured Party as the "Secured Party", Dealer as "Debtor" and identifying the Collateral; (b) authenticate, execute or endorse on behalf of Dealer any instruments, chattel paper, certificates of title, manufacturer statements of origin, builder's certificate, insurance documents or other notices or records comprising or related to the Collateral or evidence financing under the Agreement or evidencing or maintaining the perfection of the security interest granted hereby, as attorney-in-fact for Dealer; and (c) supply any missing information and correct errors in any documents between Secured Party and Dealer.  This power of attorney and the other powers of attorney granted herein are irrevocable and coupled with an interest.

**18.    Miscellaneous.**

Time is of the essence regarding Dealer's performance of its obligations to Secured Party.  Secured Party may accept this Agreement by making an advance hereunder.  Dealer's liability to Secured Party is direct and unconditional and will not be affected by the release or non-perfection of any security interest granted hereunder. Secured Party may refrain from or postpone enforcement of this Agreement or any

other agreements between Secured Party and Dealer without prejudice, and the failure to strictly enforce these agreements will not create a course of dealing which waives, amends or modifies such agreements. Any waiver by Secured Party of a Default shall only be effective if in writing signed by Secured Party and transmitted to Dealer. The express terms of this Agreement will not be modified by any course of dealing, usage of trade, or customer of trade which may deviate from the terms hereof. If Dealer fails to pay any taxes, fees or other obligations which may impair Secured Party's interest in the Collateral, or fails to keep any Collateral insured, Secured Party may, but shall not be required to, pay such amounts. Such paid amounts will be: (a) additional Obligations which Dealer owes to Secured Party, which are subject to finance charges as provided herein and shall be secured by the Collateral; and (b) due and payable immediately in full. Section titles used herein are for convenience only, and do not define or limit the contents of any Section. All words used herein shall be understood and construed to be of such number and gender as the circumstances may require. This Agreement may be validly executed in one or more multiple counterpart signature pages. Notwithstanding anything herein to the contrary, Secured Party may rely on any facsimile copy, electronic data transmission, or electronic data storage of: this Agreement, any Credit Transaction Confirmation, billing statement, financing statement, authorization to pre-file financing statements, financial statements or other reports, which will be deemed an original, and the best evidence thereof for all purposes. This Agreement shall be construed without presumption for or against any party who drafted all or any portion of this Agreement. No modification of this Agreement shall bind Secured Party unless in a writing singed by Secured Party and transmitted to Dealer. Among other symbols, Secured Party hereby adopts "Hitachi Capital America Corp.", "HCAC" or Secured Party as evidence of its intent to authenticate a record.

**19.    Limitation of Remedies and Damages.**

In the event there is any dispute under this Agreement, the aggrieved party shall not be entitled to exemplary or punitive damages and the aggrieved party's remedy in connection with any action arising under or in any way related to this Agreement shall be limited to a breach of contract action and any damages in connection therewith are limited to actual and direct damages, except that Secured Party may seek equitable relief in connection with any judicial repossession of, or temporary restraining order with respect to, the Collateral.

**20.    Arbitration; Alternative Dispute Resolution and Waiver of Jury Trial.**

Nothing herein contained shall preclude Secured Party from commencing any action in any court having jurisdiction thereof with respect to any matter arising out of, relating to or pertaining to this Agreement. However, at the sole option of Secured Party, any controversy, claim or dispute arising out of, relating to or pertaining to this Agreement or the interpretation, breach, enforcement or subject matter thereof, that cannot be settled by mutual agreement of the parties may at the sole option of the Secured Party: (i) Be submitted to arbitration by one (1) arbitrator (unless the Secured Party determines to have multiple arbitrators) with the arbitration proceedings to be conducted in Stamford, Connecticut, or such other location chosen by the Secured Party, by the American Arbitration Association, in accordance with its Commercial Arbitration Rules then in effect or conducted by any other recognized arbitration

11

association or entity in accordance with similar rules ("Arbitration"); or (ii) shall be determined through any alternative dispute resolution ("ADR") procedure provided for under the Laws of the State of Connecticut or the Dealer's state of incorporation or formation; with said governing law and ADR procedure to be selected by the Secured Party. Judgment upon any arbitration award or ADR determination may be entered in any court of any state or county or application may be made to such court through judicial acceptance of the award or determination and on order of enforcement, as the law of the jurisdiction may require or allow. The arbitration award or ADR determination shall be final and no appeal shall be taken by either party. The costs of any such arbitration or ADR shall be borne equally by the Dealer and the Secured Party, unless the arbitrator(s) or ADR decision-maker deems such division of costs to be inequitable, in which event the arbitrator(s) or ADR decision-maker may allocate the costs of arbitration or ADR among the parties thereto as s/he deems just and equitable under the circumstances. THE SECURED PARTY AND THE DEALER HEREBY WAIVE TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM BROUGHT BY OR AGAINST EACH OTHER IN RESPECT OF ANY MATTER ARISING OUT OF, RELATING TO OR PERTAINING TO THIS AGREEMENT OR THE INTERPRETATION, BREACH, ENFORCEMENT OR SUBJECT MATTER HEREOF, THE RELATIONSHIP BETWEEN THE DEALER AND THE SECURED PARTY AND/OR ANY CLAIM OF INJURY OR DAMAGE FROM ANY OTHER RELATIONSHIP BETWEEN THE PARTIES HERETO.

**21.   Notice.**

Any notice or consent required to be given by or on behalf of any party hereto to any other party shall be in writing and (a) mailed by certified mail, return receipt requested and postage pre-paid; (b) sent via a nationally recognized overnight service that regularly obtains a signature upon delivery, or (c) delivered personally, addressed to the parties as set forth above, or at such other address as may be specified from time to time in writing. All such notices hereunder shall be deemed to have been given on the date of delivery or the date marked on the return receipt unless delivery is refused or cannot be made because of any incorrect address provided by the addressee, in which case the date of postmark (or the date of delivery to the courier service, as the case may be) shall be deemed the date notice has been given.

**22.   Assignment.**

Dealer may not assign this Agreement without Secured Party's prior written consent. This Agreement shall be binding upon the successors and permitted assigns of Dealer and shall inure to the benefit of the successors and assigns of the Secured Party.

**23.   Captions.**

All captions contained in this Agreement are for convenience of reference only and shall not be deemed to be a part of this Agreement or have any legal effect in construing or enforcing this Agreement.

**24.   Severability.**

The provisions of this Agreement are severable.  In the event that any provision of this Agreement shall be deemed to be illegal, void or unenforceable by any tribunal of competent jurisdiction, such determination shall have no effect upon the remaining provisions hereof.


**Secured Party:**

**HITACHI CAPITAL AMERICA CORP.**

By: _____
Print Name: _____
Title: _____


**Dealer:**

**PRIDE TRUCK SALES L.P**

By: _S. Johal_____
Print Name: _Sulakhan S Johal_____
Title: _PRESIDENT_____

**Guaranty**

This Guaranty, made this <u>21</u> day of, <u>November</u>, 2018 by Pride Group Holdings Inc., Pride Group Logistics Ltd., TPine Leasing Capital Corporation, 2043002 Ontario Inc. and TPine Truck Rental, Inc. (separately and together, the "Guarantor");

To:    HITACHI CAPITAL AMERICA CORP.    (hereinafter, "Hitachi")
      800 Connecticut Avenue
      Norwalk, CT 06854

1.    Each Guarantor severally requests Hitachi to extend credit to or to purchase security agreements, leases, notes, accounts and/or other obligations (herein generally termed, "Paper") of or from or otherwise to do business with:

Company:    Pride Truck Sales L.P.    (hereinafter, the "Company")
            345 Grand Island Blvd
            Tonawanda, NY 14150

To induce Hitachi to extend such credit or to make such purchase, and in consideration thereof and of benefits to accrue to each Guarantor there from, each Guarantor, as a primary obligor, irrevocably and unconditionally, jointly and severally guarantees to Hitachi that the Company will fully and promptly pay and perform all of its present and future obligations to Hitachi, whether direct or indirect, joint or several, absolute or contingent, secured or unsecured, matured or unmatured and whether originally contracted with Hitachi or otherwise acquired by Hitachi, irrespective of any invalidity or unenforceability of any such obligation or the insufficiency, invalidity or unenforceability of any security therefor, whether now existing or hereinafter incurred.

Each Guarantor also agrees as follows: (1) to pay on demand all sums due and to become due to Hitachi from the Company and all losses, costs, attorneys' fees and expenses which may be suffered by Hitachi by reason of the Company's default or default of any Guarantor without Hitachi first having to proceed against the Company or to liquidate Paper or any security therefor; and (2) to be bound by and on demand to pay any deficiency established by a sale of Paper and/or security held with or without notice to any Guarantor.

2.    This Guaranty is an unconditional guaranty of payment and performance. No Guarantor shall be released or discharged, either in whole or in part, by Hitachi's failure or delay to perfect or continue the perfection of any security interest in any property which secures the obligations of the Company or any Guarantor to Hitachi, or to protect the property covered by such security interest. The obligations of each Guarantor under this Guaranty shall remain in full force and effect until all sums due to Hitachi from the Company have been paid in full and all costs and expenses, if any, referred to in Paragraph 1 herein shall have been paid in full.

3.    Each Guarantor hereby represents and warrants that: (1) it has the power to enter into and perform this Guaranty; (2) neither this Guaranty, the execution, delivery and performance hereof, the performance of the agreements herein contained nor the consummation of the transactions herein contemplated will violate any statute, ordinance, regulation, court order or decree or order or decree of any other governmental authority or agency or any other agreement to which said Guarantor is subject; and (3) this Guaranty constitutes the valid and binding obligation of each Guarantor enforceable against each Guarantor in accordance with its terms.

4.    Each Guarantor waives: (1) notice of acceptance hereof; (2) presentment, demand, protest and notice of nonpayment or protest as to any note or obligation signed, accepted, endorsed or assigned to Hitachi by the Company; (3) any and all rights of subrogation, reimbursement, indemnity, exoneration, contribution or any other claim which any Guarantor may now or hereafter have against the Company or any other person directly or contingently liable for the obligations guaranteed hereunder, or with respect to the Company's property (including, without limitation, property collateralizing the Company's obligations to Hitachi ), arising from the existence or performance of this Guaranty; (4) all exemptions and homestead laws and any other demands and notices required by law; all setoffs and counterclaims; and (5) any and all defenses based on suretyship or any other applicable law, including without limitation all rights and defenses arising out of (i) an election of remedies by Hitachi even though that election of remedies may have destroyed rights of subrogation and reimbursement against the Company by operation of law or otherwise, (ii) protections afforded to the Company pursuant to anti-deficiency or similar laws limiting or discharging the Company's obligations to Hitachi, (iii) the invalidity or unenforceability of this Guaranty, (iv) the failure to notify any Guarantor of the disposition of any property securing the obligations of the Company, (v) the requirement, if any, that Hitachi marshal assets (vi) the commercial reasonableness of such disposition or the impairment, however caused, of the value of such property, and (vii) any duty on Hitachi's part (should such duty exist) to disclose to any Guarantor any matter, fact or thing related to the business operations or condition (financial or otherwise) of the Company or its affiliates or property, whether now or hereafter known by Hitachi.

5.    Hitachi may at any time and from time to time, without the consent of any Guarantor, without notice to any Guarantor and without affecting or impairing the obligation of any Guarantor hereunder, do any of the following:

(a) renew, extend (including extensions beyond the original term of the respective item of Paper), modify (including changes in interest rates), release or discharge any obligations of the Company, of its customers, of co-guarantors (whether hereunder or under a separate instrument) or of any other party at any time directly or contingently liable for the payment of any of said obligations;

(b) accept partial payments of said obligations;

(c) accept new or additional documents, instruments or agreements relating to or in substitution of said obligations;

(d) settle, release (by operation of law or otherwise), compound, compromise, collect or liquidate any of said obligations and the security therefore in any manner;

(e) consent to the transfer or return of the security, and take hold additional security or guaranties for said obligations;

(f) amend, exchange, release or waive any security or guaranty; or

(g) bid and purchase at any sale of Paper or security and apply any proceeds or security, and direct the order and manner of sale.

6.    If a claim is made upon Hitachi at any time for repayment or recovery of any amount(s) or otherwise received by Hitachi, from any source, in payment of or on account of any of the obligations of the Company guaranteed hereunder and Hitachi repays or otherwise becomes liable for all or any part of such claim by reason of:

(a) any judgment, decree or order of any court or administrative body having competent jurisdiction; or

(b) any settlement or compromise of any such claim,

each Guarantor shall remain jointly and severally liable to Hitachi hereunder for the amount so repaid or for which Hitachi is otherwise liable to the same extent as if such amount(s) had never been received by Hitachi, notwithstanding any termination hereof or the cancellation of any note or other agreement evidencing any of the obligations of the Company. This Guaranty shall bind each Guarantor's respective heirs, administrators, representatives, successors, and assigns and shall inure to the benefit of Hitachi's successors and assigns including, but not limited to, any party to whom Hitachi may assign any item or items of Paper. Each Guarantor hereby waives notice of any such assignment. All of Hitachi's rights are cumulative and not alternative.

7.    The invalidity or unenforceability of any one or more phrases, sentences, clauses or section of this Guaranty shall not affect the validity or enforceability of the remaining portions of this Guaranty, or any part thereof.

8.    This Guaranty shall be interpreted under and governed by the laws of the State of Connecticut, without regard to conflicts of laws principles. Each Guarantor agrees that the negotiation and acceptance of this Guaranty has taken place in the State of Connecticut. The parties consent and agree that all actions or proceedings arising out of, relating to or pertaining to this Guaranty may be tried and litigated in the state and federal courts located in the State of Connecticut provided, however, that any suit seeking enforcement against the property securing the Paper may be brought, at Hitachi's option, in the courts of any jurisdiction where Secured Party elects to bring such action or where such property may be found.

9.    Nothing contained in this Guaranty shall preclude Hitachi from commencing any action in any court having jurisdiction thereof with respect to any matter arising out of, relating to or pertain to this Guaranty.   However, at the sole option of Hitachi, any controversy, claim or dispute arising out of, relating to or pertaining to this Guaranty or the interpretation, breach, enforcement or subject matter thereof, that cannot be settled by mutual agreement of the parties, may: (i) be submitted to arbitration by one (1) arbitrator (unless Hitachi determines to have multiple arbitrators) in Norwalk, Connecticut, or such other location chosen by Hitachi, conducted by the American Arbitration Association, in accordance with its Commercial Arbitration Rules then in effect or conducted by any other recognized arbitration association or entity in accordance with like rules ("Arbitration"); or (ii) be determined through any alternative dispute resolution ("ADR") procedure provided for under the Laws of the State of Connecticut or the Guarantor's state of incorporation; with said governing law and ADR procedure to be selected by Hitachi. Judgment upon any arbitration award or ADR determination may be entered in any court of any state or county or application may be made to such court for judicial acceptance of the award or determination and an order of enforcement, as the law of the jurisdiction may require or allow.   The arbitration award or ADR determination shall be final and no appeal shall be taken by either party.   The costs of any such arbitration or ADR shall be borne equally by the Guarantor and Hitachi, unless the arbitrator(s) or ADR decision-maker deems such division of costs to be inequitable, in which event the arbitrator(s) or ADR decision-maker may allocate the costs of arbitration or ADR among the parities thereto as s/he deems just and equitable under the circumstances

10.    THE GUARANTOR AND HITACHI HEREBY WAIVE TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM BROUGHT BY OR AGAINST EACH OTHER ON, OR IN

RESPECT OF, ANY MATTER ARISING OUT OF, RELATING TO OR PERTAINING TO THIS GUARANTY OR THE INTERPRETATION, BREACH, ENFORCEMENT OR SUBJECT MATTER THEREOF, THE RELATIONSHIP BETWEEN THE COMPANY AND THE SECURED PARTY AND/OR ANY CLAIM OF INJURY OR DAMAGE FROM ANY OTHER RELATIONSHIP BETWEEN THE PARTIES HERETO.

**IN WITNESS WHEREOF**, each Guarantor has executed this Guaranty as of the date first above written.

ATTEST:

Print Name: SASAN INDERJIT

TPine Leasing Capital Corporation

S. Johal

6050 DIXIE ROAD
Address
MISSISSAUGA   ON   L5T1A6
City                    State              Zip


ATTEST:

Print Name: SASAN INDERJIT

Pride Group Holdings Inc.

S. Johal

6050 DIXIE ROAD
Address
MISSISSAUGA   ON   L5T1A6
City                    State              Zip


ATTEST:

Print Name: SASAN INDERJIT

Pride Group Logistics Ltd

S. Johal

6050 DIXIE ROAD
Address
MISSISSAUGA   ON   L5T1A6
City                    State              Zip


ATTEST:

Print Name: SASAN INDERJIT

2043002 Ontario Inc

S. Johal

6050 DIXIE ROAD
Address
MISSISSAUGA   ON   L5T1A6
City                    State              Zip


ATTEST:

Print Name: SASAN INDERJIT

TPine Truck Rental Inc.

S. Johal

6050 DIXIE ROAD
Address
MISSISSAUGA   ON   L5T1A6
City                    State              Zip

ACKNOWLEDGEMENT

STATE OF _____          )
                                 )SS.
COUNTY OF _____            )

       BE IT REMEMBERED, that on this ____ day of _____, ___, before me, the subscriber, personally appeared _____, Social Security No. _____, who I am satisfied is the individual who signed the within Instrument; and I having first made known to him the contents thereof, he did acknowledge that he signed, sealed and delivered the same as his voluntary act and deed, for the uses and purposes therein expressed.


                            _____

                            Notary Public:
                            My Commission Expires:

# Exhibit C

## FORBEARANCE, WAIVER AND REAFFIRMATION AGREEMENT

THIS FORBEARANCE, WAIVER AND REAFFIRMATION AGREEMENT (this "**Agreement**") is dated as of November _10_ 2020, and is by and between Hitachi Capital America Corp. ("**Secured Party**") and Pride Truck Sales L.P., a Delaware limited partnership ("**Dealer**") and the Guarantors listed on <u>Schedule 1</u> hereto, the "**Guarantors**" and together with Dealer, the "**Obligors**").

## RECITALS:

**WHEREAS,** Secured Party and Dealer are parties to that certain Floorplan and Security Agreement dated November 21, 2018 (the "**Floorplan Agreement**") pursuant to which Secured Party agreed from time to time to extend credit to or on behalf of Dealer to purchase inventory.

**WHEREAS**, under Section 4(d)(3) of the Floorplan Agreement, Dealer agreed it would not without Secured Party's prior written consent "change its … organizational structure … or change its registration to a registered organization other than as specified above …."

**WHEREAS**, under Section 4(d)(5) of the Floorplan Agreement, Dealer agreed that it would not without Secured Party's prior written consent "change the state in which it is incorporated or otherwise organized (except upon thirty (30) days' prior written notice to Secured Party) …."

**WHEREAS**, as of the date of the Floorplan Agreement, Dealer was organized as a New York limited partnership.

**WHEREAS**, without notice to Secured Party, on July 24, 2019, Dealer and its affiliate TP Leasing Capital L.P. submitted notices of conversion in Delaware, which, according to Delaware law, allows for the conversion of another entity into a Delaware limited partnership.

**WHEREAS**, pursuant to the filed notices of conversion and applicable Delaware law, Dealer converted from a New York limited partnership to a Delaware limited partnership.

**WHEREAS**, as a result of Dealer's conversion from a New York limited partnership to a Delaware limited partnership, a Default (as defined in the Floorplan Agreement) occurred (the "**Dealer Default**").

**WHEREAS**, Obligors request that Secured Party forbear from exercising its remedies on account of the Dealer Default and then waive the Dealer Default, which Secured Party is willing to do, subject to the terms and conditions set forth herein.

**NOW, THEREFORE,** in consideration of the foregoing Recitals and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged by the parties hereto, the parties hereby agree as follows:

1.      <u>Defined Terms.</u>  Capitalized terms not otherwise defined herein shall have the meanings ascribed thereto in the Floorplan Agreement.

2.      <u>Acknowledgements.</u>

(a)      The Recitals to this Agreement are true and correct and are an integral part of this Agreement and are hereby incorporated into and made a part hereof.

(b)      Secured Party has and shall continue to have a valid and enforceable security interest in the Collateral heretofore granted to Secured Party pursuant to the Floorplan Agreement and nothing contained in this Agreement shall waive, modify, impair, or otherwise impact Secured Party's security interests in, and/or claims against, the Collateral.

(c)      (i) Each of the Floorplan Agreement and Guaranties to which Dealer or Guarantors are a party has been duly executed and delivered to Secured Party by them, and each is in full force and effect as of the date hereof, (ii) the agreements and obligations of Dealer and Guarantors contained in such documents and in this Agreement constitute the legal, valid and binding obligations of Dealer and Guarantors, enforceable against them in accordance with their respective terms, and Dealer and Guarantors have no valid defense to the enforcement of such obligations, and (iii) Secured Party is and shall be entitled to the rights, remedies and benefits provided for in the Floorplan Agreement and applicable law.

(d)      The Dealer Default exists and is continuing, and constitutes a material default under the Floorplan Agreement, which entitles Secured Party to exercise its rights and remedies, or any of them, under the Floorplan Agreement, applicable law and otherwise.  Except as otherwise expressly provided herein, Secured Party has not waived, and specifically reserves, its rights and remedies under the Floorplan Agreement with respect to the Dealer Default, and except as otherwise expressly provided herein, nothing contained herein shall be deemed to constitute any such waiver.

3.      <u>Forbearance and Waiver.</u>

(a)      Commencing on the date hereof and continuing through the Forbearance Termination Date (as defined herein), Secured Party shall forbear from exercising its rights and remedies on account of the Dealer Default.

(b)      As used herein, the term "**Forbearance Termination Date**" means the earlier of (i) the date all executed No Interest Letters (as defined herein) required by Secured Party are received by Secured Party, (ii) the date of the occurrence of an additional Default or a default under this Agreement, or (iii) November 30, 2020.

(c)      Upon the delivery of the No Interest Letters to Secured Party prior to November 30, 2020 and so long as no additional Default occurred and no default occurred under this Agreement, then the Dealer Default shall be deemed waived.



- 2 -

(d)     As used herein, the term "**No Interest Letters**" mean those certain letters in substantially the form attached hereto as <u>Exhibit 1</u> or as otherwise accepted by Secured Party, from the lenders listed on <u>Schedule 2</u> hereto, providing that each such lender has no security interest in, other lien upon, or any other right, title or interest in the Hitachi Capital Collateral (as defined therein).

4.     <u>Forbearance and Waiver Fee</u>.  As additional consideration for the agreements of Secured Party under this Agreement and as a condition to the effectiveness of this Agreement, Dealer shall pay to Secured Party a forbearance and waiver fee (the "**Fee**") in the amount of $16,000.00.  The Fee shall be due and payable by November 20, 2020.

5.     <u>Reaffirmation.</u>

(a)     Dealer hereby reaffirms that all of its agreements, obligations and liabilities owing to Secured Party under the Floorplan Agreement are in full force and effect and that the conversion of Dealer from a New York Limited Partnership to a Delaware Limited Partnership did not, in any way, affect or diminish such agreements, obligations and liabilities.

(b)     Each of the Guarantors hereby acknowledges the terms and conditions set forth in the Floorplan Agreement and this Agreement and hereby expressly ratifies and reaffirms its agreements, liabilities and obligations as set forth in the Guaranties as of the date hereof, to and for the benefit of Secured Party.

6.     <u>No Defenses</u>.  Obligors hereby represent and warrant to Secured Party that they possess no claims, defenses, offsets, recoupment or counterclaims of any kind or nature against Secured Party or with respect to the enforcement of the Floorplan Agreement or any Guaranty (collectively, "**Claims**"), nor do Obligors have any knowledge of any facts that would or might give rise to any Claims.  If facts now exist which would or could give rise to any Claim against or with respect to the enforcement of the Floorplan Agreement or any Guaranty, then each of the Obligors hereby unconditionally, irrevocably and unequivocally waives and fully releases any and all such Claims as if such Claims were the subject of a lawsuit, adjudicated to final judgment from which no appeal could be taken and therein dismissed with prejudice.

7.     <u>Supplemental Agreements</u>.

(a)     Obligors shall either pay directly or reimburse Secured Party for all of its costs and expenses, including legal fees, incurred in connection with the Dealer Default and in connection with the preparation of this Agreement.  In addition, Obligors shall pay or reimburse Secured Party for all reasonable legal fees and other costs and expenses incurred by Lender in connection with the administration, amendment, modification or enforcement of this Agreement and the collection of the of all amounts owing under the Floorplan Agreement and the Guaranties.



(b)      At any time and from time to time after the date hereof, the parties shall upon request by the other and without further consideration, do, perform, execute, acknowledge and deliver all such further acts, deeds, assignments, assumptions, transfers, conveyances, powers of attorney, certificates and assurances as may be reasonably required in order to fully consummate the transactions contemplated hereby in accordance with this Agreement or to carry out and perform any undertaking made by the parties hereunder, including without limitation, obtaining the executed No Interest Letters.

8.      <u>Representations, Warranties and Covenants</u>.  Dealer and each Guarantor hereby represents, warrants and covenants to Secured Party as follows:

(a)      other than with respect to the state of organization of Dealer, the representations and warranties of Dealer in the Floorplan Agreement are true and correct as of the date hereof;

(b)      Dealer is a Limited Partnership organized under the laws of the State of Delaware and is in good standing;

(c)      the representations and warranties of each Guarantor set forth in its Guaranty are true and correct as of the date hereof; and

(d)      this Agreement has been duly authorized, executed and delivered on behalf of Dealer and Guarantors, and this Agreement constitutes the legal, valid and binding obligation of Dealer and Guarantors, enforceable in accordance with its terms.

9.      <u>Conditions Precedent</u>.   The obligation of Secured Party to enter into this Agreement and the agreements of Secured Party contained herein are subject to the following conditions precedent:

(a)      Dealer and Guarantors shall have entered into, executed, and delivered to Secured Party a fully executed original of this Agreement; and

(b)      Dealer shall have paid to Secured Party the Fee and all costs and expenses, including legal fees, incurred by Dealer through the date of this Agreement.  Chemical Bank and Dealer and Guarantors shall have entered into, executed and delivered to Secured Party a copy of an agreement on substantially the same terms as this Agreement.

10.      <u>Representation by Counsel</u>.  Dealer and each Guarantor hereby represents that it has been represented by competent counsel of its choice in the negotiation and execution of this Agreement; that it has read and fully understands the terms hereof, that Dealer and such Guarantor and its counsel have been afforded an opportunity to review, negotiate and modify the terms of this Agreement, and that they intend to be bound hereby.

11.      <u>Consents</u>.  Dealer and each Guarantor represents that this Agreement does not violate any provision of any instrument, document, contract or agreement to which Dealer or such Guarantor is a party, or Dealer and each Guarantor hereby represents that it has obtained all requisite consents under those third party instruments prior to entering into this Agreement.



12.     Entire Agreement.  This Agreement together with the Floorplan Agreement and the Guaranties constitutes the entire agreement of the parties hereto with respect to the subject matter hereof and supersedes all other understandings, oral, written or imputed.  This Agreement shall not be charged or terminated orally or by course of conduct, but only by a writing signed by all parties.

13.     Counterparts.  This Agreement may be executed in any number of counterparts, and by the different parties hereto and thereto on the same or separate counterparts, each of which, when so executed and delivered, shall be deemed to be an original; all the counterparts for this Agreement shall together constitute one and the same agreement.

NO FURTHER TEXT ON THIS PAGE
SIGNATURE PAGE FOLLOWS

**IN WITNESS WHEREOF,** the parties hereto have caused this Forbearance Agreement and Reaffirmation of Guaranties to be executed and delivered.

<u>**SECURED PARTY:**</u>

**Hitachi Capital America Corp.**

**By:** _____
**Name:** _____
**Title:** _____

<u>**DEALER:**</u>

**Pride Truck Sales L.P.**

By: _S. Johal_
Name: _Sulakhan Johal_
Title: _Partner_

<u>**GUARANTORS:**</u>

**Pride Truck Sales Ltd.**

By: _S. Johal_
Name: _Sulakhan Johal_
Title: _President_

**Pride Hospitality, Ltd.**

By: _S. Johal_
Name: _Sulakhan Johal_
Title: _President_

**Pride Group Holdings, Inc.**

By: _S. Johal_
Name: _Sulakhan Johal_
Title: _President_

**Pride Group Logistics Ltd.**

By: _S. Johal_
Name: _Sulakhan Johal_
Title: _President_

Signature Page Continued

**TPine Leasing Capital Corporation**

By: _____
Name: _____
Title: _____

**TPine Truck Rental Inc.**

By: _____
Name: _____
Title: _____

**2043002 Ontario Inc.**

By: _____
Name: _____
Title: _____

**Sulakhan Johal**

By: _____
Name: _____
Title: _____

**Jasvir Johal**

By: _____
Name: _____
Title: _____

**SCHEDULE 1**

**Guarantors**

Pride Truck Sales Ltd.
Pride Hospitality, Ltd.
Pride Group Holdings, Inc.
Pride Group Logistics Ltd.
TPine Leasing Capital Corporation
TPine Truck Rental Inc.
2043002 Ontario Inc.

## SCHEDULE 2

**Lenders from which No Interest Letters are required**

**EXHIBIT 1**

**No Interest Letter Form**

ON BANK LETTERHEAD

Hitachi Capital America Corp.
800 Connecticut Avenue
Norwalk, CT 06854_____
Attn: _____

Re:    Pride Truck Sales L.P. ("Debtor") - No Interest in Inventory (as defined herein)

_____ [*insert name of Bank*], in its own capacity, and in any capacity for which it is currently or hereafter acting as secured party of record, and/or as agent, for any third parties, "Secured Party") has or may have a security interest or other lien ("Secured Party's Security Interest") in certain of Debtor's assets. To induce Hitachi Capital America Corp. ("Hitachi Capital") to extend financing to Debtor and provide other financial accommodations to Debtor, Secured Party hereby confirms that Secured Party does not claim, and shall not claim during the term of Hitachi Capital's financing of Debtor, a security interest in, other lien upon, or any other right, title or interest in that certain Inventory (as defined in Section 9-102(a)(48) of the Uniform Code manufactured and/or distributed by _____ (*if too many manufacturers or distributors, then add a schedule*) and all proceeds of such Inventory. financed prior to or subsequent to the date of this letter by Hitachi Capital pursuant to that certain Floorplan and Security Agreement dated November 21, 2018, between Hitachi Capital and the Debtor, together with all schedules and riders thereto, in each case, as amended or otherwise modified from time to time (the "Hitachi Capital Collateral"). To the extent that a security interest or other lien in favor of Secured Party exists, or may hereafter exist during the term of Hitachi Capital's financing of Debtor, with respect to the Hitachi Capital Collateral, Secured Party hereby disclaims, terminates and releases any such security interest, other lien or other right, title or interest. In furtherance of the foregoing, Secured Party agrees that: (i) it will not take any action to bar, restrain or otherwise prevent Hitachi Capital from inspecting, removing or taking possession of all or any portion of the Hitachi Capital Collateral, (ii) if Secured Party obtains possession of any Hitachi Capital Collateral, Secured Party shall turn over such Hitachi Capital Collateral upon Hitachi Capital's written request therefor, (iii) the above release and disclaimer shall apply irrespective of the time or order of attachment or perfection of security interests, and (iv) if requested in writing by Hitachi Capital, Secured Party will, at the expense of Debtor, execute and deliver, in form and substance satisfactory to Secured Party, such other documents as may be reasonably requested by Hitachi Capital to evidence the above termination, release and disclaimer.

It is expressly understood and agreed that the release set forth herein shall not apply to any assets of Debtor other than the Hitachi Capital Collateral and all existing security interests in favor of Secured Party in such assets (other than the Hitachi Capital Collateral) of Debtor and all obligations owing by each Debtor to Secured Party shall remain in full force and effect. The release set forth herein is not effective to release any rights in the Hitachi Capital Collateral re-acquired by any Debtor upon termination of the Hitachi Capital financing agreements.

10

Secured Party represents to Hitachi Capital that Secured Party has not heretofore assigned Secured Party's Security Interest to any third-party assignee, and covenants to Hitachi Capital that Secured Party shall not assign Secured Party's Security Interest to any third-party assignee without concurrently notifying any such assignee of the existence of this agreement, delivering a true copy of same to any such assignee and obtaining the agreement of such assignee to be bound, in the same manner as Secured Party, to the terms of this agreement. This agreement shall be binding upon Secured Party's successors and assigns.

This letter agreement shall remain in full force and effect notwithstanding that Hitachi Capital or Secured Party modifies or amends, by agreement or otherwise, any of their respective agreements with Debtor. This agreement shall be governed and construed in accordance with the laws of the State of New York (without regard to the conflict of laws principles thereof).

Yours truly

_____

# Exhibit D

Mitsubishi HC Capital America Inc.
800 Connecticut Avenue, 4th Floor North
Norwalk, Connecticut 06854-1631

December 21, 2023

**Via Electronic Mail and FEDEX**
Tpine Leasing Capital LP
34880 Lyndon B. Johnson Fwy
Dallas, TX 75241
Attention:  Mr. Chris Petersen
Email: chris@pridegroupenterprises.com

Pride Truck Sales LP
Pride Truck Sales Ltd.
Tpine Truck Rental Inc.
Tpine Leasing Capital Corporation
TPine Rental USA
6050 Dixie Road
Mississauga, Ontario LST 1A6
Attention:     Kav Hamzavi
E-mail:        kav@pridegroupenterprises.com

**RE:   NOTICE OF DEFAULTS AND RESERVATION OF RIGHTS**

Dear Sirs:

Reference is hereby made to (i)  that certain Master Lease Receivables Sale and Assignment Agreement, dated as of May 25, 2021 (as amended, restated, supplemented or otherwise modified, the "Master Assignment Agreement") between Tpine Leasing Capital LP, a limited partnership organized under the law of the state of Delaware ("Tpine") and Mitsubishi HC Capital America Inc. (f/k/a Hitachi Capital America Corp.), a Delaware corporation ("MHCA"); (ii) that certain Servicing and Remarketing Agreement (the "Servicing Agreement") dated as of May 25, 2021 between MHCA and Tpine; (iii) that certain Second Amended and Restated Program Agreement ("Program Agreement") dated as of May 31, 2023 between MHCA and Tpine; (iv) that certain Floorplan and Security Agreement dated November 21, 2018 between Pride Truck Sales LP ("Pride Truck"), as dealer and MHCA (as successor by merger to Hitachi Capital America Corp.), as secured party (the "US Floorplan Agreement"); (v) that certain Master Purchase and Servicing Agreement dated as of March 23, 2023 between TPine Capital Leasing Corporation ("TCCL"), Mitsubishi HC Capital Canada, Inc. ("MHCCA" and, together with MHCA, "Mitsubishi"), Mitsubishi Capital Canada Leasing, Inc. and Pride Truck Sales Ltd. (the "Canadian MPSA"); and (vi) that certain Floorplan and Security Agreement dated March 23, 2023, between Pride Truck Sales Ltd., TLCC and TPine Truck Rental Inc., as dealers and MHCCA, as secured party (the "Canadian Floorplan Agreement" and together with the Master Assignment Agreement, the Servicing Agreement, the Program Agreement, the US Floorplan Agreement and the Canadian MPSA, the "Financing Documents").

Pursuant to Section 4.2(c) of the Master Assignment Agreement, Tpine represents and warrants that, except as set forth therein, none of the Lease Receivables and other Transferred Assets (each as defined under the Master Assignment Agreement) were assigned to any other Person or are subject to any lien other than that created thereby.

Page 2

MHCA was notified by Tpine on December 21, 2023 that certain Lease Receivables and Transferred Assets were also assigned to another third party purchaser or lender, and therefore, an Event of Default under Section 3.3(e) of the Master Assignment Agreement occurred (the "***Assignment Agreement Specified Default***"). The Assignment Agreement Specified Default is continuing and remains uncured.

Pursuant to Section 6.01(c) of the Servicing Agreement, an event of default shall occur upon a breach by Tpine of any of its obligations under the Assignment Agreement, therefore a Servicer Event of Default (as defined thereunder) has occurred thereunder (the "***Servicing Specified Default***"). The Servicing Specified Default is continuing and remains uncured.

Pursuant to Section 5.1(l) of the Program Agreement, Tpine represents and warrants that, it has not assigned or pledged any part of the rights assigned thereunder to anyone other than MHCA or its designees. MHCA was notified by Tpine on December 21, 2023 that certain Contracts assigned thereunder were also sold or assigned to another third party purchaser or lender, and therefore, an Event of Default under Section 7.1(a) of the Program Agreement occurred (the "***Program Agreement Specified Default***"). The Assignment Agreement Specified Default is continuing and remains uncured.

Pursuant to Section 7(n) of the US Floorplan Agreement, a Default (as defined therein) occurs if MHCA in good faith believes the prospect of payment of any Obligations (as defined therein) is impaired or it deems itself insecure. MHCA was notified by Pride Truck on December 21, 2023 that certain Collateral (as defined therein) was also sold or assigned to another third party purchaser or lender, and therefore, an Event of Default under Section 7(n) of the US Floorplan Agreement occurred (the "***US Floorplan Specified Default***"). The US Floorplan Specified Default is continuing and remains uncured.

Pursuant to Section 5.1(a) of the Canadian MPSA, TLCC represents and warrants that each Relevant Finance Contract that is described or otherwise identified in the related Purchase Summary is an Eligible Finance Contract as at the Related Purchase Date, and the definition of Eligible Finance Contract includes that upon the transfer thereof to the Purchaser, it will be owned by and be the property of the Purchaser, free and clear of Liens other than any Liens created by the Purchaser and the right of each Obligor to use the related Equipment (each of the foregoing capitalized terms as defined under the Canadian MPSA). MHCCA was notified by TLCC on December 21, 2023 that certain Purchased Assets were assigned to another third party purchaser or lender, and therefore, an Event of Termination under the Canadian MPSA has occurred (the "***Canadian MPSA Specified Default***"). The Canadian MPSA Specified Default is continuing and remains uncured.

Pursuant to Section 7(n) of the Canadian Floorplan Agreement, a Default (as defined therein) occurs if MHCCA in good faith believes the prospect of payment of any Obligations (as defined therein) is impaired or it deems itself insecure. MHCCA was notified by TLCC on December 21, 2023 that certain Collateral (as defined therein) was also sold or assigned to another third party purchaser or lender, and therefore, an Event of Default under Section 7(n) of the Canadian Floorplan Agreement occurred (the "***Canadian Floorplan Specified Default***", and together with the Assignment Agreement Specified Default, the Program Agreement Specified Default, the Servicing Agreement Specified Default, the US Floorplan Specified Default and the Canadian MPSA Specified Default, the "***Specified Defaults***"). The Canadian Floorplan Specified Default is continuing and remains uncured.

The Specified Defaults are not intended to be a statement of all defaults (howsoever defined) that may have occurred and be continuing under each of the Financing Documents. Mitsubishi reserves its right to provide subsequent notices of default. As a result of the Specified Defaults, Mitsubishi has the option to exercise those rights and remedies available to it under each of the applicable Financing Documents and applicable law. Without limiting the foregoing, Mitsubishi may elect to immediately initiate any and all rights and remedies, available to it under each of the applicable Financing Documents or otherwise, and hereby reserves its right to do so.

Page 3

      For the avoidance of doubt, any failure or delay by Mitsubishi in exercising any right, power, or remedy under any applicable Financing Document, at law or in equity, or any acceptance of partial performance or partial payment (a) shall not operate as a waiver of such right, power, or remedy, nor shall any single or partial exercise of any such right, power, or remedy preclude any other or further exercise of such right, power, or remedy or the exercise of any other right, power, or remedy, and (b) shall not be sufficient, by itself or together with any other action or inaction by Mitsubishi to establish a course of dealing or course of conduct by Mitsubishi (with any such prior course of dealing or conduct, if any, hereby terminated).

      This letter is not intended to be, nor shall it be construed as, a waiver of the Specified Defaults or any other Default, Event of Default, Event of Termination, Servicer Termination Event, term or condition of any Financing Document.  No waiver of any term or requirement of any of the Financing Documents shall be effective unless it is in an express signed writing, and any express written waiver shall not be construed to imply any other or further waiver other than as specifically stated therein.  Mitsubishi hereby reserves all of its rights and remedies under each of the Financing Documents and all applicable laws.

Very truly yours,

Cc:    Sulakhan Johal
       Jasvir Johal
       Pride Fleet Solutions Inc.
       Pride Group Holding Inc.
       Pride Group Logistics Ltd.
       2043002 Ontario Inc.
       2076401 Ontario Inc.
       Pride Group EV Sales Ltd.